David **PARRIS**, Plaintiff–Respondent,

v.

**UNI MED, INC.**, Defendant–Appellant.

No. 62180.

Missouri Court of Appeals,
Eastern District,
Division Three.

Aug. 3, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 8, 1993.

Application to Transfer Denied
Oct. 26, 1993.

Donald L. James, T. Michael Ward, Brian Howe, Brown & James, P.C., St. Louis, Manuel Drumm, II, Sikeston, for defendant-appellant.

Toni Griesbach, St. Louis, for plaintiff-respondent.

SMITH, Judge.

Defendant appeals from a verdict and judgment in plaintiff's favor and against defendant in the amount of $2 million dollars in this negligence case. We affirm.

Defendant on appeal challenges the sufficiency of the evidence to establish defendant's liability and therefore to support the verdict. We therefore review the evidence in the light most favorable to the verdict.

Uni Med is the marketer and distributor of a special hospital bed—the Mediscus bed. The bed is a complex piece of equipment. It is designed with 21 separate air pockets or cushions. These are divided into five separate units or sections each intended to support a different portion of the human anatomy—the head, trunk, seat, thigh and calf. Each section is controlled by a separate gauge which independently regulates the air pressure in that section. An air blower in the bed circulates a continuous flow of air throughout the air pockets which keeps the patient's skin dry and prevents moisture buildup. The gauges are protected by a guard designed to preclude inadvertent or accidental tampering or changing of the gauge settings. The purpose of the bed is to prevent the development of decubitus ulcers (bedsores) in patients whose condition makes them particularly subject to such ulcers, and to promote the healing of such ulcers in patients who already have them.

Plaintiff was and is such a patient. At the time of the hospitalization involved here plaintiff was thirty seven years of age. At age twenty he was involved in a falling accident which rendered him a paraplegic, with very limited feeling in his lower body and none in his sacral area. Prior to June 1987, plaintiff, while confined to a wheelchair, was very active, able to dress himself, perform his bodily functions, tend to his physical needs, drive, and remain in his wheelchair for up to eighteen hours a day. Plaintiff is required to wear a catheter and is, as a result, subject to urinary tract infections. In January 1987, plaintiff was admitted to St. Francis Hospital in Cape Girardeau for a urinary tract infection. While in the hospital he utilized a Mediscus bed. In May 1987, he was again admitted to the hospital for testing of an abrasion in the sacral area which would not respond to treatment and which turned out to be a decubitus ulcer. While in the hospital on that occasion he was diagnosed as diabetic. During that hospitalization plaintiff utilized a Mediscus bed. In his testimony at trial plaintiff described the setting up of the bed in May by the Uni Med employee. The set-up took an hour and one half and involved numerous adjustments of the bed by the employee. At the time of his discharge on

May 31 the pressure sore was "only barely apparent". Plaintiff was again admitted to the hospital on June 14, 1987, for a urinary tract infection. At the time of the admission the pressure sore was healing up, was pink, and was described as Class 1, the least severe level of decubitus ulcer. Again he was placed in a Mediscus bed which was set-up on June 15. The evidence at trial was that on this occasion set-up of the bed took five minutes. The Uni Med employee who set up the bed (different than the employee involved in the May set-up) stated that he would return before he left for St. Louis but did not.

On June 17 a nurse noted two pressure areas the size of a nickel with epidermis gone but no drainage. On June 19 another nurse noted that the ulcer condition had deteriorated and a new pressure sore had developed. The ulcerated area was at that time rated as Class 2. The nurse attempting to determine why the ulcerated area continued to deteriorate determined that the duoderm dressing covering the ulcer was in contact with the metal frame of the bed meaning that pressure was being exerted on plaintiff's sacral area when he was in a sitting position. Plaintiff was in a sitting position frequently during this hospitalization. The nurse lowered plaintiff to a supine position, examined the gauges and called Uni Med. She was advised that the settings were correct but she insisted that a technician be sent to check the bed. Four or five hours later a technician from Uni Med arrived. He adjusted upward the pressure settings for the seat and thigh sections of the bed. Thereafter the bed worked properly and no further apparent deterioration of the ulcerated site occurred. There was evidence that some improvement in the decubiti was observed prior to and at the time of plaintiff's discharge from the hospital on June 26. Despite treatment at home by a visiting nurse and plaintiff's brother the sores deteriorated until surgical intervention was required. Plaintiff's evidence was that following the surgery he requires round the clock nursing assistance, is limited to brief periods of time in the wheel chair, and is unable to function

in any acceptable fashion. Expert testimony of the extent of his damages was presented.

Plaintiff presented evidence that nurses were not instructed in the operation of the bed and were advised by Uni Med employees not to adjust the gauges, but to call the company if problems occurred. There was evidence that under-inflation of the sections of the bed could not be determined by visual examination. There was testimony that Uni Med had no regular schedule for monitoring the beds and that periods of a week or longer could pass without monitoring. There was considerable evidence that the nurses and plaintiff were advised by Uni Med either directly or through literature that it was unnecessary to turn the patients who were on the bed. Plaintiff testified that based on that advice he declined a turning schedule because of the discomfort and nausea it caused him.

There was expert testimony that nurses should have been trained by the defendant to adjust or regulate the beds. There was expert testimony that the bed should have been monitored by defendant at least every other day. Expert testimony was also adduced that turning of patients every two hours was still required even with the Mediscus bed.

Plaintiff submitted four disjunctive theories of liability: (1) that defendant negligently set-up the bed; (2) that defendant negligently failed to monitor the system; (3) that defendant negligently failed to instruct nurses in how to identify and manage pressure loss; and (4) that defendant negligently failed to instruct nurses in how to care for patients using the bed, i.e. the necessity of turning the patients every two hours. While defendant takes ·some issue with whether plaintiff adequately proved each of these failings the main thrust of its argument is that there was no expert testimony that any of these failures were the proximate cause of plaintiff's damages.

■ A plaintiff may prove essential facts by circumstantial evidence "so long as the facts proved and the conclusion to be drawn 'are of such a nature, and are so connected and related to each other, that the conclusion ... may be fairly inferred.'" *Ward by Walker v. McQueen,* 670 S.W.2d 176

(Mo.App.1984) [1, 2] (quoting *Morris v. Israel Brothers, Inc.,* 510 S.W.2d 437, 442 (Mo. 1974). Furthermore, absent compelling evidence establishing an absence of causation, the issue is one for the jury. *Menschik v. Mid–America Pipeline Company,* 812 S.W.2d 861 (Mo.App.1991) [3]. A plaintiff makes a submissible case on causation if he presents substantial evidence that his injury is a "natural and probable consequence" of defendant's negligence. If the logical conclusion from the evidence is that if certain things had been properly done certain results would not have occurred, and such results did occur, the evidence of causation is sufficient. *Jines v. Young,* 732 S.W.2d 938 (Mo. App.1987) [1–3]; *Delisi v. St. Luke's Episcopal–Presbyterian Hospital, Inc.,* 701 S.W.2d 170 (Mo.App.1985) [10–13].

■ As to the first theory the evidence was sufficient to allow the jury to conclude that the bed was not properly set-up. The brief period of time (five minutes) as compared to the lengthy period (1½ hours) required for the May set-up is evidence that the job was hastily done. The bed is designed to maintain its pressures once those pressures are established as evidenced by the infrequency of monitoring considered necessary by defendant and even plaintiff's experts. The evidence was clear that as little as two hours of continuous pressure on a section of skin can cause decubitus ulcers. It is reasonable to infer that if the bed was subject to loss of pressure more frequent monitoring would be required either by defendant or by the nurses. The evidence was that such monitoring was not required. The evidence was that no nurse changed the pressure settings. The gauges were protected by a guard rail to prevent inadvertent changes. One of plaintiff's experts testified that if the pressure on June 19 was such that plaintiff was touching the metal frame then either the bed was defective or the gauges were improperly set. After the gauges were reset on June 19 the bed functioned properly eliminating the alternative that the bed was defective. The jury could reasonably infer that the cause of the inadequate pressure setting on June 19 was that the bed was improperly set-up on June 15 by defendant's employee.

This is further strengthened by the evidence that by June 17 plaintiff's ulcerations were getting worse indicating that the bed was not performing its function prior to that date.

■ Submissions (2), (3), and (4) all had evidentiary support that defendant failed to do the things submitted and that such failures were negligent.

■ We turn to defendant's main contention that plaintiff failed to establish proximate causation. This is based predominately on the assertion that no expert testimony definitively stated that the defendant's failures caused or contributed to cause plaintiff's decubitus ulcer and the subsequent surgery necessary to correct that condition. It may be conceded, and plaintiff does so concede, that expert testimony stating that certain things "could" have caused plaintiff's damages does not by itself establish causation. But such evidence can be taken together with other evidence in determining if plaintiff made a submissible case of causation. *Ketcham v. Thomas,* 283 S.W.2d 642 l.c. 649 (Mo.1955) [9].

■ The jury had before it the following evidence: When plaintiff entered the hospital on June 14 his ulcer was healing and was at the lowest grade. Plaintiff was placed in Mediscus bed on June 15. The bed was hastily set up. The bed is designed and intended to prevent pressure on the skin of the patient and to keep the skin dry. Decubitus ulcers are caused by and require continuous pressure on the skin area for at least two hours. Moisture increases the potential for formation of such ulcers. On June 17 plaintiff had developed a second ulcer. By June 19 the level of severity had moved up one class. On June 19 a nurse attempting to determine why plaintiff's condition was deteriorating rather than improving discovered that plaintiff's sacral area was in contact with the bed frame when he was sitting producing pressure on the sacral area where the ulcer was located. Plaintiff spent considerable time sitting while in the hospital. Plaintiff was unable, because of his paralysis, to know that pressure was being exerted on his sacral area. After discovery of the inadequate pressure in two sections of the bed and cor-

rection of that condition the deterioration of the ulcer while in the hospital stopped. Upon his discharge from the hospital the decubitus ulcer was still present and thereafter his condition deteriorated resulting in the surgery and plaintiff's subsequent change in condition and lifestyle. With these facts before it, plus the testimony of experts that defendant's actions or inactions "could" have caused plaintiff's condition, the jury could reasonably and logically infer that the ulcer condition was either created by or exacerbated by the conduct of the defendant. The long and short of it is that plaintiff's condition should have improved on the bed, instead it worsened, and the worsening was caused by pressure which if the bed were properly set-up and monitored could not have occurred. The jury could also with the evidence before it have concluded that if the nurses had been properly trained by defendant, if the bed had been properly monitored by the defendant or properly trained nurses, or if the patient had been turned every two hours his condition would not have worsened but would have improved. His condition on admission was with a "nearly healed" pressure sore, four days later it was a Class 2 sore. The plaintiff made a submissible case.

Defendant also attacks the verdict-directing instruction on essentially the same basis that the evidence did not support giving the instruction. What we have heretofore said is equally applicable to that argument.

■ Defendant also contends that the verdict-directing instruction was erroneous in failing to require the jury to find that plaintiff's sacral area was in a pressure situation on June 19 for a long enough period of time to have caused an ulcer. This contention misperceives plaintiff's theory. He did not contend that the June 19 episode was what caused the decubitus ulcer exacerbation. The June 19 episode was the discovery by the nurse of the inadequate pressure in the seat section of the bed which the jury could have found existed from June 15 on and which inadequacy at some point prior to June 19 caused the exacerbation. We find no merit to the point.

Finally, the defendant premises error on allowing expert testimony from nurses concerning decubitus ulcers, their cause and treatment. The trial court is vested with great discretion in determining whether an expert will be allowed to testify. *Seabaugh v. Milde Farms, Inc.* 816 S.W.2d 202 (Mo. banc 1991) [7–9]. The witnesses here possessed outstanding qualifications in the nursing field. One of the important functions of nurses is to prevent the formation of decubitus ulcers in bed-ridden patients. Both witnesses here had extensive experience in that area and in particular with patients suffering from serious paralysis. We find no abuse of the trial court's substantial discretion.

Judgment affirmed.

GARY M. GAERTNER, P.J., and STEPHAN, J., concur.