**Timothy J. BUTTS, Plaintiff–Respondent,**

v.

**EXPRESS PERSONNEL SERVICES and Teresa Connor, Defendants–Appellants.**

No. 24274.

Missouri Court of Appeals,
Southern District,
Division One.

March 28, 2002.

Motion for Rehearing and Transfer Denied April 19, 2002.

Application for Transfer Denied May 28, 2002.

Laurence R. Tucker, Armstrong Teasdale LLP, Kansas City, for appellants.

Michael J. Patton, Joseph P. Winget, Turner, Reid, Duncan, Loomer & Patton, P.C., Brad Bradshaw, Eric M. Belk, Springfield, for respondent.

KENNETH W. SHRUM, Presiding Judge.

In this personal injury suit arising out of an "on-the-job" accident, a jury found for Timothy J. Butts ("Plaintiff") and against Teresa Connor ("Connor"), an employee of Express Personnel Services ("Express").[1] On appeal, Defendants' claim reversal is mandated because (1) the trial court lacked subject matter jurisdiction; (2) there was insufficient evidence to support the verdict; (3) the verdict-directing instruction was erroneous; (4) the court erred in an evidentiary ruling; and (5) newly discovered evidence, i.e., evidence first learned about after trial, would have affected the outcome of the case.[2] We disagree. We affirm.

## FACTS

On April 12, 1995, Plaintiff and Connor had been assigned by different employers as temporary workers at a Rawlings Sporting Goods warehouse in Springfield, Missouri, when Plaintiff sustained an injury that led to this suit. Specifically, Plaintiff was working for a firm called "Manpower," whereas Connor was working for Express. Both Manpower and Express were temporary service firms, that is, they hired workers who were then temporarily assigned to other companies on an "as needed" basis.

At the time of the accident, Plaintiff was removing boxes containing baseballs from a conveyor belt and stacking them inside a semi-truck trailer. The conveyor, which had metal rollers but was not motorized, extended from the end of a dock to the interior of the trailer. The conveyor was operated by persons outside the trailer who filled the conveyor with boxes and then pushed each newly loaded box against those already on the rollers. As Plaintiff explained it, the "boxes don't crash together on their own[;]" "for any box to be moving somebody has to be doing something to the boxes."

Plaintiff testified that he was working with a person named Bob Cosby. At the time, Plaintiff was inside the trailer taking boxes off the conveyor and stacking them. Cosby was outside the trailer unloading boxes from a forklift and placing them on the conveyor. When Cosby finished unloading his forklift, he left to go to the restroom. After Cosby left, Plaintiff con-

---

1. When referring to Express and Connor collectively, we call them "Defendants."

2. Although the verdict was against Connor only, the trial court entered judgment against both Connor and Express based on a stipulation by the parties that Express, as employer of Connor, was responsible for any percentage of fault assessed against Connor.

tinued unloading boxes from the conveyor belt. As Plaintiff lifted a box "eight or ten inches off the conveyor," with his left hand under the box, Plaintiff "heard a bang" and felt his left hand being "smashed between two boxes." Thereon, Plaintiff yelled and turned around to see what was going on at the loading end of the trailer. It was then that Plaintiff first knew of Connor's involvement in this incident. He explained it as follows:

"Q. [To Plaintiff:] [W]hen this incident happened ..., you didn't actually see what may have contacted the end of the boxes?

"A. That's correct, sir.

"Q. So you ... can't tell this jury with any degree of certainty that a forklift contacted the end of these boxes. Isn't that right?

"A. I disagree with that personally. I mean, as soon as it hit I turned around and looked and Ms. Connor was getting off the forklift saying she was sorry, she was sorry, she was just trying to scare me.

"Q. And you drew the conclusion from that somehow or other her load had contacted the boxes?

"A. Yes, sir."

At the time Plaintiff's hand was injured, there were at least forty boxes on the conveyor belt, with some of the boxes weighing as much as seventy pounds.

Connor's recollection of the accident differed from that of Plaintiff. Connor testified she drove a forklift up to the rear of the trailer where Plaintiff was working, lowered the "skid down on the floor of the dock[,]" got off the forklift, and was loading boxes on the conveyor when Plaintiff's

hand got smashed. Although Connor could not recall who was pushing the boxes on the conveyor when Plaintiff got hurt, Bob Cosby's written statement about the accident included the following:[3]

"Teresa Connor brought her order to the loading area. Teresa transported her skid or cart to this area by using a battery powered hand jack. My order had to be completely loaded before she could start her own order. To speed this up, Teresa began helping me load my order onto the conveyor. At this particular time I had the conveyor fairly full of cartons. Teresa began pushing the cartons closer together on the conveyor to make room for more cartons. I did not observe Teresa check to see if Tim was clear of the conveyor and boxes before moving the boxes. She moved the boxes by placing her hand flat against the side of a carton and using the strength in her arm, push[ed] the boxes together. The boxes then quickly came together not crunched together resulting in an injury to Tim's hand."

Much of the other evidence dealt with the nature and extent of Plaintiff's injuries and damage issues. The jury returned a verdict for Plaintiff in the amount of $820,900 and assessed fault as follows: Fifty-one percent to Connor and forty-nine percent to Plaintiff. Thereon, the trial judge entered judgment for Plaintiff and against Defendants for $418,659. Defendants appeal from the judgment thus entered.

### Did The Trial Court Have Subject Matter Jurisdiction?

Preliminarily, we consider Defendants' claim that the trial court lacked subject matter jurisdiction over this case.

---

3. At trial, Mr. Cosby testified he had "no recollection" about "how [the accident] happened" but identified a document entitled "witness statement" as a "record of [his] rec- ollection at the time" he signed it on July 4, 1995. Mr. Cosby's written statement was offered and received in evidence. What we have reproduced is part of that document.

Specifically, Defendants maintain in Point IV that Connor and Plaintiff had the same statutory employer, i.e., Rawlings; therefore, Defendants argue the pair were "co-employees."[4] Based on this premise, Defendants argue that Plaintiff must allege and prove "something extra," i.e., "something beyond a breach of . . . duty of general supervision and safety[,]" *State ex rel. Badami v. Gaertner,* 630 S.W.2d 175, 179, 180 (Mo.App.1982), before liability grounded on negligence principles may be imposed on Connor. Defendants base this argument on the assumption that the immunity from common law suit provided by the "The Workers' Compensation Law" (the "Act")[5] extends to both Express and Connor.[6] On this assumption, Defendants argue that unless Plaintiff pleaded and proved affirmative negligent acts by Connor (which Defendants insist Plaintiff did not prove), Plaintiff could not proceed on her common law suit against Connor. *See, e.g. Workman v. Vader,* 854 S.W.2d 560, 564 (Mo.App.1993) (holding an employee who works for an employer with statutory immunity can only be sued at common law for his or her *affirmative negligent acts* that cause injury to a co-employee). We disagree. Based on our conclusion below

that Express was not immune from Plaintiff's common law suit, Plaintiff did not have to meet the "something more" test of *Badami* as a precursor to suing Connor. 630 S.W.2d at 175.

■■■ Neither the exclusion clause (§ 287.120) nor the subrogation provision (§ 287.150) of the Act abolishes an employee's common law right to recover damages from a negligent "third person" for injuries sustained by the employee while on the job.[7] *Schumacher v. Leslie,* 360 Mo. 1238, 232 S.W.2d 913, 916–18 (banc 1950); *State ex rel. W.J. Menefee Constr. Co. v. Curtis,* 321 S.W.2d 713, 719[2] (Mo.App. 1959). Although the Act, via § 287.150, does subrogate the employer to the right of the injured employee to proceed against a third person, the employee may sue the third person tortfeasor without the employer joining in the suit. *Schumacher,* 232 S.W.2d at 916; *General Box Co. v. Missouri Utilities Co.,* 331 Mo. 845, 55 S.W.2d 442, 444–45 (1932). A "third person" within the meaning of the Act means " 'one upon whom no liability could be entailed under the act[ ]' " to provide an injured employee with workers' compensation benefits. *Schumacher,* 232 S.W.2d at 918[7] (citation omitted). Stated other-

---

4. The phrase "statutory employer" is derived from § 287.040.1 which provides that "[a]ny person who has work done under contract on or about his premises which is an operation of the usual business which he there carries on shall be deemed an employer and shall be liable under [the Act] to such contractor, his subcontractors, and their employees, when injured or killed on or about the premises of the employer while doing work which is in the usual course of his business." Case law clarifies that § 287.040.1 "establishes a constructive employment relationship in order to extend workers' compensation coverage to employees of employers who have work done pursuant to a contract." *Miller v. McDonnell Douglas Corp.,* 896 S.W.2d 734, 736[6] (Mo. App.1995).

5. When referring to specific statutes within the Act, all references are to RSMo (2000).

6. Pursuant to § 287.120.2, the rights and remedies granted an employee under the Act "shall exclude all other rights and remedies of the employee . . ., except such rights and remedies as are not provides by this chapter."

7. In relevant part, § 287.150 provides:
"1. Where a third person is liable to the employee . . . for the injury . . ., the employer shall be subrogated to the right of the employee . . . against such third person, and the recovery by such employer shall not be limited to the amount payable as compensation to such employee, but such employer may recover any amount which such employee . . . would have been entitled to recover."

wise, "[a] third person is one with whom there is no master and servant relationship under the Act." *Id.* at 918[8].

With the term "third person" as used in § 287.150 thus interpreted, it logically followed that courts would find a "co-employee" to be a "third person" within the meaning of § 287.150 and "that [such co-employee could] be sued by an injured co-employee for his negligence resulting in the compensable injury." *Badami*, 630 S.W.2d at 177. However, the *Badami* court limited the scope of such suits when the co-employees in question, i.e., the injured employee and the tortfeasor employee, both worked for an employer who had immunity from general tort liability. The *Badami* court ruled that if co-employees are involved in tort litigation arising from an on-the-job accident and if both work for an employer with immunity, the injured employee must charge the tortfeasor employee with "something more" than breach of the duty to provide a reasonably safe place to work. *Id.* at 180[3]. As the *Badami* court explained it, the general duty to provide a safe work place belongs to the employer, but is ordinarily delegated to an employee. Because such delegation ordinarily occurs, the court reasoned that immunity (enjoyed by the employer) from a breach of such duty should flow to the employee. *Id.* Continuing, the court observed:

"The purpose of the Act was not to transfer the burden of industrial accidents from one employee to another. . . . Under present day industrial operations, to impose upon executive officers or supervisory personnel personal liability for an accident arising from a condition at a place of employment which a jury may find to be unsafe would almost mandate that the employer provide indemnity to such employees. That would effectively destroy the immunity provisions of the workmen's compensation law."

*Id.*

In analyzing Defendants' argument that Plaintiff had to meet the "something more" requirement of *Badami*, we begin by recalling that Connor was an employee of Express, temporarily assigned to Rawlings, whereas Plaintiff was an employee of Manpower on temporary assignment to Rawlings. Based primarily on *Menefee*, 321 S.W.2d 713, which we discuss in detail below, we are persuaded that the Act did not give Express immunity from general tort liability for Plaintiff's injury caused by Connor's negligence; consequently, Plaintiff's claim is not constrained by the *Badami* "something more" rationale.

In *Menefee*, the employee ("Chew") of the general contractor ("Koss") sued a subcontractor ("Menefee") and two of its employees seeking to recover damages for injuries he sustained in an on-the-job accident while all were working on the same project, i.e., highway construction. 321 S.W.2d at 714–15. Chew alleged the accident was due to the negligence of Menefee's employees. After Chew's suit was filed, Menefee asked this court to prohibit the circuit judge from proceeding with the common law action. The writ was quashed, and the case dismissed after we found that "no relationship of an employer and employee [was] created between [Menefee] and [Chew], either actually or by statute." *Id.* at 719. We held that § 287.040.4, "which makes the immediate contractor or subcontractor liable as an employer of his subcontractor, in no way, can be construed to affect the rights of an employee of the immediate contractor." *Id.* at 719[1]. After a lengthy analysis of cases from other states, we adopted the majority view "that a subcontractor is a 'third person' against whom a suit will lie by an employee of the principal for injuries

sustained by the negligence of the subcontractor's employee although the employees are engaged in a common employment." *Id.* at 719[3].

In *Anderson v. Steurer*, 391 S.W.2d 839 (Mo.1965), the Supreme Court of Missouri tacitly approved the *Menefee* decision. There, Anderson, who worked for a "lathing" subcontractor named Stroup, was injured when he fell from a scaffold after a plank broke. Anderson sued Steurer, a lathing/plasterer subcontractor, to recover damages for his injuries based on allegations that Steurer was negligent in furnishing the scaffolding. Steurer defended on the ground that he had immunity via the Act; that he had subcontracted with Moeller Construction (the general contractor) to do the plaster and lathing work, and he (Steurer) had then subcontracted with Stroup for Stroup to do the lathing. On appeal from a summary judgment dismissing his suit, injured-employee Anderson argued, *inter alia,* that the case of *Bunner v. Patti,* 343 Mo. 274, 121 S.W.2d 153 (Mo.1938) (holding the employee of a subcontractor may not sue the general contractor as a negligent third party for negligence resulting in an "on-the-job" injury to the employee), did not support Steurer's defense. He cited *August Viermann Bricklaying Co. v. St. Louis Contracting Co.,* 335 Mo. 534, 73 S.W.2d 734 (Mo.1934), and *Menefee,* 321 S.W.2d 713, to argue that the law in Missouri permitted "an employee of one subcontractor [to] sue another subcontractor on the same job for negligence and that the defense permitted under *Bunner v. Patti, supra,* is not available to the subcontractor." *Anderson,* 391 S.W.2d at 844. The *Anderson* court disagreed, explaining:

"In the Viermann case the general contractor on the job was Dunham Construction Company. It made a subcontract with Viermann for the bricklaying work and a separate direct contract with St. Louis Contracting Company for stonework on the job. There was no contractual relationship between Viermann and St. Louis Contracting. An employee of Viermann was hurt and paid compensation. Then Viermann, based upon its subrogation rights, sued St. Louis Contracting as a third party for negligence. Understandably, the question of statutory employer was not raised. There was no conceivable basis for holding St. Louis Contracting to be liable to an employee of Viermann for compensation. In the Menefee case ... the principal was Koss Construction Company. It subcontracted certain work to Menefee. An employee of Koss was injured on the job. He then sued Menefee as a third party for negligence. This was held to be permissible, the court recognizing that Menefee was not a statutory employer of Chew, the injured employee of Koss. Menefee could have no liability for workmen's compensation to him. Thus both of those cases clearly are distinguishable."

*Id.* at 844. Thus, the *Anderson* court confirmed the implicit holding of *Menefee* to the effect that the immunity granted by the workers' compensation statutes applies only to direct, linear relationships of employment. *See also, Canady v. Crystal Devel. Corp.,* 756 S.W.2d 607, 612 (Mo.App. 1988) (holding a defendant in negligence would have immunity via the Act if it were an "intermediate" subcontractor but not if it were a "parallel" subcontractor, i.e., no immunity attended where two subcontractors were "separately and independently employed" by the general contractor).

The only factual distinction between *Menefee* and this case is that Plaintiff is further down the chain, that is, Plaintiff is an employee of a subcontractor (Manpower), whereas the plaintiff in *Menefee* was an

employee of the principal employer (Koss). This is a distinction without a difference. The analysis, reasoning, and result reached in *Menefee* is dispositive here. As no employer/employee relationship existed between Plaintiff and Express, either actually or by statute, Plaintiff's common law right to sue Express in tort remained inviolate per § 287.150. *Id.* Because the Act provided Express with no immunity from Plaintiff's suit, Connor had no immunity therefrom; consequently, the *Badami* "co-employee" analysis has no applicability here. Point denied.

### Did Plaintiff Fail To Make Submissible Case of Negligence?

In Point III, Defendants allege the trial court erred when it overruled their motion for judgment notwithstanding the verdict because Plaintiff "failed to make a submissible case" of negligence.[8] Specifically, Defendants claim there was no evidence that proved a negligent act was committed by Connor; furthermore, Defendants assert that any actions by Connor were not the proximate cause of Plaintiff's injury. We disagree.

"A case may not be submitted unless each and every fact essential to liability is predicated upon legal and substantial evidence." *Giddens v. Kansas City Southern Ry. Co.*, 29 S.W.3d 813, 818[1] (Mo.banc 2000), *cert. denied*, 532 U.S. 990, 121 S.Ct. 1644, 149 L.Ed.2d 502 (2001). In deciding if a plaintiff has made a submissible case, we view the evidence in the light most favorable to the jury's verdict and give the plaintiff the benefit of all reasonable inferences and disregard evidence and inferences conflicting with the

verdict. *Id.* at 818[2]. We can only reverse when there is a complete absence of probative facts to support the verdict. *Id.* at 818[3]. "A judgment notwithstanding the verdict is a drastic action, and it should only be granted when reasonable persons could not differ on a correct disposition of the case." *Coggins v. Laclede Gas Co.*, 37 S.W.3d 335, 339[13] (Mo.App.2000).

In a negligence case, a plaintiff must establish: (1) a duty in the defendant to protect the plaintiff from injury; (2) the failure by a defendant to perform that duty; and (3) the defendant's failure proximately caused injury to the plaintiff.[9] *Lopez v. Three Rivers Elec. Co-op., Inc.*, 26 S.W.3d 151, 155 (Mo.banc 2000). The law imposes a duty upon a person to exercise ordinary care so as not to injure another. *Hamilton v. Ross*, 304 S.W.2d 812, 814 (Mo.1957). We first address Defendants' contentions regarding the second prong of the elements of negligence, i.e., there was no *breach* of a duty.

There were two factual hypotheses given to the jury in the verdict-directing instruction. One posited that Connor drove a forklift into the conveyor belt which caused boxes to crush Plaintiff's hand, and she was thereby negligent. The other postulated that Connor shoved boxes on the conveyor belt into Plaintiff's hand, and that she was thus negligent. Defendants initially argue there was no evidence to submit the "forklift issue" because there was no direct evidence, or logical inference, that showed Connor drove the forklift or that the forklift itself or its load struck the conveyor belt.[10]

---

8. Because our holding regarding Point III will necessarily affect Points I and II, we address it initially.

9. Here, Defendants challenge the second and third elements.

10. Defendants do not contend this act falls below the standard of care, nor do we think they reasonably could do so. Connor admitted that "horseplay" such as trying to scare someone with a forklift was against the rules.

"The concept of a 'submissible case' contemplates the establishment of each element of a cause of action by such evidence or inference, and a total failure of proof as to any one element of the cause of action constitutes a missing link breaking the chain of facts...." *In re Estate of Zeppenfeld*, 593 S.W.2d 890, 893[4] (Mo.App.1979). One crucial link in this chain is the breach of a duty by some act or omission. *Id.* at 893. A plaintiff can prove any essential fact by circumstantial evidence so long as the facts proven and the conclusion to be drawn are of such a nature and so connected that the conclusion may be fairly inferred. *Parris v. Uni Med, Inc.*, 861 S.W.2d 694, 697 (Mo.App.1993).

Here, Plaintiff testified he was unloading boxes from the conveyor belt when he heard a "bang" and immediately looked toward the end of the truck. Then, he saw Connor get off the forklift, walk toward him, and say, "I'm sorry. [I] was just trying to scare [you]." Also, Plaintiff testified there was no forklift at that location prior to the bang because Cosby had driven his forklift toward the restroom. Moreover, unless someone or something touched the boxes on the conveyor, which was full, the boxes would not move. The boxes did move, and the only person and object near the conveyor belt were Connor and the forklift.

The fact Plaintiff did not directly see Connor drive the forklift into the conveyor belt is not fatal to submissibility.[11] A reasonable and logical inference that can be drawn from the evidence recounted above is that Connor was operating the forklift and allowed it to hit the conveyor belt; an act which fell below the standard of care. Any argument to the contrary lacks merit.

We consider next Defendant's argument that if the jury disbelieved Plaintiff's testimony that Connor's operation of the forklift caused his injury, then Plaintiff failed to make a submissible case because he did not prove "Connor did anything [else] which was characterized as being careless." As we understand the argument, Defendants allege that the only other evidence was that Connor put the boxes on the conveyor, which was her job. In making that argument, Defendants fail to consider all of the evidence.

Connor testified that the person loading the boxes on the conveyor must watch "very carefully and closely" the person unloading the boxes to make sure boxes were not shoved into that person's hands. She also testified that when pushing boxes on the conveyor, a verbal warning, i.e., "heads up," was something that would help avoid smashing someone's hand. However, when asked if she gave such warning just before Plaintiff was injured, Connor answered, "I don't believe so." Cosby testified he did not see Connor check to see if Plaintiff's hands were clear before "push[ing] the boxes together." Moreover, Connor stated she could not even see Plaintiff from where she was standing because boxes were "towering" over her, and that she was not supposed to "thrust" or "push" the boxes. This is evidence from which the jury could reasonably infer that (1) Connor put the boxes on the conveyor belt without checking to see if Plaintiff was clear, (2) she then pushed the boxes together, again without looking, and (3) such actions fell below the standard of care.

**11.** In many civil cases, there is no direct proof of acts. For instance, many drivers have had their licenses revoked in administrative proceedings even though no one actually saw them driving the car, or sometimes even in the car. *See Cox v. Dir. of Revenue*, 37 S.W.3d 304 (Mo.App.2000); *Delzell v. Lohman*, 983 S.W.2d 633 (Mo.App.1999); *Baptist v. Lohman*, 971 S.W.2d 366 (Mo.App.1998).

We turn now to Defendants' final argument relating to submissibility, namely, that Plaintiff failed to prove causation. "Absolute certainty is not required in proving a causal connection between a negligent defendant's actions and the plaintiff's injury." *Coggins*, 37 S.W.3d at 339[17]. A submissible case is made on this issue if substantial evidence is presented that shows the injury is a natural and probable consequence of a defendant's negligence. *Parris*, 861 S.W.2d at 697[2].

It is wholly permissible for the jury to infer causation from circumstances. *Coggins*, 37 S.W.3d at 339. "If the logical conclusion from the evidence is that if certain things had been properly done certain results would not have occurred, and such results did occur, the evidence of causation is sufficient." *Parris*, 861 S.W.2d at 697[3]. A causal connection is often established by showing facts and circumstances which "fairly suggest" negligence as the proximate cause in light of ordinary circumstances. *Wilson v. Kaufmann*, 847 S.W.2d 840, 847[10] (Mo.App. 1992). "In the absence of compelling evidence establishing the absence of causation, the causation question is for the jury." *Coggins*, 37 S.W.3d at 339[19].

As discussed earlier, there was sufficient evidence to submit the "forklift issue" or that Connor pushed the boxes on the conveyor causing them to crush Plaintiff's hand. We are wholly unable to discern any reasonable argument that, in either of these two factual instances, the test for causation is not met. Both acts breached a duty of care to Plaintiff. The boxes did not move on their own; there must have been some force applied. Plaintiff's hand was crushed between the boxes coming down the conveyor belt. The boxes came down the conveyor because either (1) Connor hit the belt with the forklift or its load, or (2) Connor pushed the boxes down the conveyor. There was no other evidence to the contrary; therefore, the causation question was one for the jury. *Id.* Point denied.

## Was There Evidence That Supports Verdict–Directing Instruction?

Defendants' second point complains the trial court erred in submitting a jury instruction that allowed the jury to find liability based on the "forklift issue" mentioned in Point III. Defendants allege this was error because there was no substantial evidence to support such an hypothesis. In our discussion of Point III, we decided that question adversely to Defendants. No purpose would be served by rehashing the subject. Based on our analysis of the evidence under Point III, we find there was sufficient substantial evidence to support submission of the "forklift" hypothesis to the jury. The trial court did not err in giving the verdict-directing instruction. Point denied.

## Was It Reversible Error To Give Disjunctive Verdict Director?

In Point I, Defendants allege the trial court erred by submitting a verdict-directing instruction that posed to the jury two factual hypotheses in the disjunctive. We earlier paraphrased the instruction but now reproduce the relevant part as follows:

"First, either:

defendant Connor shoved boxes into the fingers and hand of [Plaintiff], or

defendant ... Connor drove a forklift into the conveyor belt where [Plaintiff] was working, thereby causing boxes to strike [Plaintiff's] hand and fingers, and

Second, defendant Connor was thereby negligent, and

Third, such negligence directly caused or directly contributed to cause damage to [Plaintiff]."

Defendants claim it is reversible error to submit an instruction that hypothesizes "two mutually inconsistent factual" theories because "[b]elief in one theory destroys the belief in the other." Defendants argue that Connor either drove the forklift or shoved the boxes by hand, but it was impossible to do both. In forming their argument, Defendants rely heavily upon *Whittom v. Alexander–Richardson Partnership*, 851 S.W.2d 504 (Mo.banc 1993). Their reliance on *Whittom* is misplaced.

In *Whittom*, the Supreme Court of Missouri granted transfer to examine the continued validity of the election between inconsistent theories doctrine because of a suggestion by the Eastern District Court of Appeals that the doctrine "may be an 'anachronism' under rules that allow pleading of claims or defenses in the alternative." *Id.* at 505. Although the *Whittom* court discussed the doctrine and analyzed pre-MAI cases in which the doctrine was applied, the discussion was not necessary to the court's decision. This follows because it found the two theories before it, i.e., prescriptive easement and common law dedication, were not truly inconsistent considering the facts of the case. *Id.* at 506. Consequently, the pronouncements made in *Whittom* regarding the election of theories doctrine are technically obiter dicta. *See State ex rel. Anderson v. Hostetter*, 346 Mo. 249, 140 S.W.2d 21, 24 (banc 1940).

We further note the *Whittom* court, when analyzing the election of theories doctrine, only discussed cases decided before 1965. In 1965, the promulgation of pattern instructions drastically changed how juries were instructed in civil cases. One such change was to prohibit "[t]he practice of submitting dual or multiple theories of recovery or defense *in the conjunctive* [.]" MAI 1.02. Before MAI 1.02 was adopted, it was customary practice to submit theories in the conjunctive because "[t]his practice enabled [parties], in most cases, to avoid reversible error when it developed that one or more of their theories was not supported by evidence." MAI 1.02, Committee Comment (1996). The cases cited in *Whittom* for the rule that an election must be made between inconsistent theories are only applicable in certain factual settings. The cases in *Whittom* are ones where there were multiple theories of recovery or defenses submitted in the conjunctive, and the cases normally involved attempts to submit both general and humanitarian negligence. Those are not the facts of this case, and as stated, conjunctive submissions are now prohibited. MAI 1.02.

The inapplicability of the doctrine of election of theories to a case such as this one is best explained in *Cook v. Holcomb*, 854 S.W.2d 78 (Mo.App.1993).

"Each of these cases which required an election [between inconsistent theories] involved a submission of humanitarian negligence coupled with a conflicting submission of primary negligence. So far as is disclosed in the opinions, none involved submission in separate or alternative counts. In addition it appears that in each instance the plaintiff was seeking to have the jury draw diametrically opposite inferences from a *single set of facts*. Similarly, in *Wallace v. Bounds*, [369 S.W.2d 138, 141 (Mo. 1963)], the plaintiff was required to elect which statutory cause of action, personal injury or wrongful death, would be submitted to the jury where the evidence proffered to support both theories was the same and the causes of action were mutually exclusive.

"In contrast, where there is independent and conflicting evidence to support either of two factual scenarios which would make a submissible case or defense but could not both be true, the cases have routinely approved submission of both theories *in the disjunctive.* In *Piggs [Pigg] v. Bridges,* 352 S.W.2d 28 (Mo.banc 1961), for example, the court affirmed the grant of a new trial in an action for personal injuries resulting from a fall down a dimly lit flight of stairs because the defendant's submission of a contributory negligence instruction which submitted that the plaintiff could have discovered the stairway *and* at the same time he could not have discovered the stairway. Although the conjunctive submission of the contradictory findings was deemed error, the court noted that there was evidence to support each hypothesis and held that defendants would be entitled to submit them in the *disjunctive* upon retrial. 352 S.W.2d at 31. *See also Sanders v. Carl Berry Oil Co.,* 359 S.W.2d 769, 771–72 (Mo.1962)."

*Id.* at 81.

■ "To reverse on grounds of instructional error, the party challenging the instruction must show that the offending instruction, misdirected, misled or confused the jury." *Choate v. Natvig,* 952 S.W.2d 730, 734[9] (Mo.App.1997). Moreover, when "an instruction is disjunctive, all submissions must be supported by substantial evidence." *Wuerz v. Huffaker,* 42 S.W.3d 652, 655[2] (Mo.App.2001). "Substantial evidence is that evidence which, if true, is probative of the issues and from which the jury can decide the case." *Id.* at 655[3].

■ Previously, we found sufficient evidence in the record to support each disjunctive factual hypothesis set out in the verdict-directing instruction given this jury. Defendants have made no convincing argument that this verdict director was confusing or misleading. What the record does show is that the jury was required to determine which set of facts actually occurred. Specifically, the jury was not required to "draw diametrically opposite inferences from a *single set of facts.*" Setting forth in the disjunctive two differing factual scenarios and requesting the jury to determine which occurred "is part and parcel of the jury's function." *Cook,* 854 S.W.2d at 82; *see also Foster v. Catalina Indus., Inc.,* 55 S.W.3d 385, 391 (Mo.App.2001). As there is no showing that this was confusing or misleading to the jury, we find no error in the disjunctive submission.

■ In so ruling, we do not ignore Defendants' argument that the two hypotheses should have been submitted in *separate* instructions. Defendants apparently advance this argument because the instructions approved in *Cook* were submitted separately. However, the *Cook* decision was not based on the fact that the disjunctive submissions were in separate instructions, nor does it appear the court even considered such as a necessary predicate to properly instructing the jury; consequently, Defendants reliance on *Cook* is misplaced. In Missouri, disjunctive submission of differing factual scenarios in the same verdict director is wholly permissible, with the only caveat being that there must be evidentiary support for each disjunctive hypothesis. *See, e.g.,* MAI 35.02–35.05 (1996); *King v. Morgan,* 873 S.W.2d 272, 278 n. 5 (Mo.App.1994); *Reed v. Sale Mem'l Hosp. and Clinic,* 698 S.W.2d 931, 938[13] (Mo.App.1985).[12] Point denied.

---

**12.** Defendants' conclusory arguments regarding prejudice, i.e., that certain jury members

· may have believed different scenarios leaving a verdict not supported by nine members, are

### Did Reversible Error Result From Admission Of Documentary Exhibits?

■ Defendants' Point V maintains the court committed reversible error when it admitted, over Connor's objection, exhibits made up of medical bills and a summary of those bills. Defendants allege the two exhibits should have been excluded as hearsay because there was no proper foundation for their introduction. Although Defendants' arguments arguably have merit and the exhibits should not been admitted, we need not decide that question. This follows because Defendants have not shown that they were prejudiced by the placement of the exhibits before the jury.

■ "The admission of evidence claimed to be hearsay is reversible error only if the complaining party is prejudiced." *State ex rel. Missouri Highway and Transp. Comm'n v. McDonald's,* 896 S.W.2d 652, 655[3] (Mo.App.1995). The party objecting to the hearsay evidence has the burden of establishing prejudice. *Nettie's Flower Garden v. SIS Inc.,* 869 S.W.2d 226, 230[9] (Mo.App.1993). Although evidence is sometimes received, which on reflection, should have been excluded, a judgment should not be reversed unless the error materially affects the merits of the action. *Bailey v. Valtec Hydraulics, Inc.,* 748 S.W.2d 805, 808[7] (Mo. App.1988); Rule 84.13(b).[13] We reproduce verbatim Defendants' entire allegation of prejudice:

"[Defendants] were prejudiced as the [Plaintiff's] claim rested largely on the medical treatment he incurred in 1995, which were supposedly represented by the bills in Exhibit 5. The fact that three (3) of the pages of the bills have nothing to do with medical treatment was never revealed to the jury, and presented as evidence over the objection of the [Defendants]. The only quantification of [Plaintiff's] past medical bills was found in Exhibit Number 5. Without that exhibit there was no competent evidence of those bills."

■ Conclusory allegations of prejudice, such as these, are wholly insufficient to comply with mandatory briefing requirements. *See In re T.E.,* 35 S.W.3d 497, 506 (Mo.App.2001). Moreover, Defendants do not even mention prejudice in their point relied on. Allegations of error not properly briefed "shall not be considered [on] appeal." Rule 84.13(a); *Martin v. Buzan,* 857 S.W.2d 366, 368 (Mo.App. 1993). However, errors not properly briefed and not preserved "may be considered on appeal, in the discretion of the court ... when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Rule 84.13(c).

Here, Plaintiff initially testified that his medical bills totalled $8,858 without objection. The document exhibits to which Defendants did object were not offered until much later in the trial; consequently, the exhibits about which Defendants complain were only cumulative of evidence already in the record. Moreover, the jury's verdict awarded to Plaintiff totalled over $820,000, meaning that the past medical bills were only a small percentage of the

---

deemed abandoned. Defendants have not supported their arguments with *any* authority, nor explained its absence. *Champion v. J.B. Hunt Transport, Inc.,* 6 S.W.3d 924, 931 (Mo. App.1999). Moreover, we have concluded there was no instructional error; therefore, it necessarily follows Defendants were not prejudiced.

**13.** This is not a case where the rule of presumptive prejudice would apply, nor do Defendants argue such application. *See State ex rel. Highway Comm'n v. Baker,* 505 S.W.2d 433, 437 (Mo.App.1974).

damages; less than two percent thereof. Also, the jury found Plaintiff was forty-nine percent at fault; a finding that reduced his recovery to $418,659. On this record, we cannot say that the admission of the medical bills and summary materially affected the case. We find no manifest injustice or miscarriage of justice resulting from the admission of this evidence. Point denied.

### Did Newly Discovered Evidence Or Perjury Mandate New Trial?

In their final point on appeal, Defendants argue that evidence uncovered after trial mandated sustention of their motion for new trial. In that regard, Defendants produced post-trial affidavit testimony that Plaintiff had worked full-time as "painter and handy-man" for an apartment complex from May 1 to September 29, 2000. Defendants allege that Plaintiff's trial testimony and claims of debilitating pain are directly refuted by this newly discovered evidence; consequently, Defendants contend the outcome of the trial would have been different had this evidence been before the jury.

As a pre-trial matter, Plaintiff had answered an interrogatory about his current employer by writing, "N/A." He gave that answer on May 24, 2000. Later, at trial in January of 2001, Plaintiff testified on cross-examination as follows:

"Q: And while you were down in Beaumont, if I understand correctly, you've not been engaged in any other kind of employment. Is that right?

"A: The apartment complex, I try to help them out.

"Q: What do you do around there?

"A: This was actually in Orange. Basically if they called—one of the people called and had a stopped toilet or what-ever, I would go over and, you know—it wasn't anything. I was just someone there that they could call. I wasn't there very much."

After trial, Defendants learned that Plaintiff worked for the complex nearly five months and earned over $9,000 during this time. Defendants' post-trial motion advanced arguments that Defendants were entitled to a new trial on the basis of newly discovered evidence that materially affected the outcome of the trial, and on the theory that Plaintiff had committed perjury.

On appeal, Defendants' point relied on makes no mention of perjury as a basis for compelling a new trial. Defendants first advance this proposition in the argument section of their brief; consequently, it is not preserved. This follows because allegations of error not raised in the point relied on and first found in the argument section of a brief need not be considered by this court. *Pearman v. Department of Social Services*, 48 S.W.3d 54, 55[2] (Mo.App.2001). Defendants provide only a conclusory statement in their brief that Plaintiff's at-trial testimony was perjurious.[14] Wholly absent from the brief is any comparison of the affidavit testimony to Plaintiff's testimony. Conclusory allegations are insufficient to comply with mandatory briefing requirements. *See In re T.E.*, 35 S.W.3d at 506.

Even so, we have reviewed the record, *ex gratia*, and conclude the trial court did not err in refusing to grant a new trial based on Defendants' allegations of perjury. "Granting a new trial on the ground of perjury requires a showing that the witness wilfully and deliberately testified falsely." *M.E.S. v. Daughters of Charity*, 975 S.W.2d 477, 482[5] (Mo.App.

14. In its entirety, Defendants' argument reads: "[Plaintiff's] testimony at time of trial appears to be perjurious and, as such, should authorize the granting of a new trial."

1998). One of Defendants' affidavits came from Elva Hernandez, the apartment manager. She declared that Plaintiff worked full-time at the apartment complex between May 1 and September 29, 2000, and earned over $9,000. However, these assertions do not prove Plaintiff willfully and deliberately testified falsely. Plaintiff's at-trial testimony was that he worked at an apartment complex, but was not there very much. He explained that if he received a call, he would fix the problem. The Hernandez affidavit does not flesh out whether Plaintiff's job required him to constantly be on the premises or whether he was free to go about his personal life, yet receive a full-time wage because he was always on call to fix problems. On this record, the Hernandez affidavit does not show Plaintiff perjured himself.

▋ The second affidavit was provided by Nancy Ashworth, a human resources employee who hired Plaintiff. This affidavit declared Plaintiff used his allegedly disabled hand in many physical activities such as painting, laying of tiles, hanging light fixtures, and replacing and repairing toilets. Plaintiff testified he would fix "stopped toilets or whatever." Although Plaintiff did not elaborate at trial about his job duties, defense counsel never asked specific questions about the job. " 'Precise questioning is imperative as a predicate for the offense of perjury.' " *Keltner v. K-Mart Corp.*, 42 S.W.3d 716, 722 (Mo.App. 2001) (*quoting Bronston v. United States*, 409 U.S. 352, 362, 93 S.Ct. 595, 602, 34 L.Ed.2d 568 (1973)). Moreover, this affidavit does not prove Plaintiff testified falsely at trial. Plaintiff's "whatever" comment may have referred to painting, laying tiles, and hanging light fixtures. Even if this affidavit showed Plaintiff was lying,

this standing alone is insufficient to demonstrate perjury. *See State v. Heed,* 57 Mo. 252, 254 (1874) (holding the oath of an opposing witness is insufficient by itself to convict one of perjury, but must be corroborated by "strong and clear evidence").[15] These affidavits, *at best,* would tend to discredit Plaintiff. *See Sly v. Union Depot Ry. Co.,* 134 Mo. 681, 36 S.W. 235, 238 (Mo.1896) (wherein court noted that to overturn a jury verdict for perjury, one must be convicted of perjury or dead so as to preclude conviction). We find no manifest injustice or miscarriage of justice in the denial of the motion for new trial on the basis of perjury.

▋ Defendants next allege that the trial court erred in denying their motion for new trial on the basis of newly discovered evidence. Defendants' allegations are based on the same affidavits described above. A new trial can only be granted on proof of the following: (1) the evidence has come to the party's knowledge since trial; (2) due diligence would not have uncovered the evidence sooner; (3) the new evidence is so material it would probably produce a different result; (4) the new evidence is not cumulative; (5) the affidavit of the witness must be produced or its absence accounted for; and (6) the object of the evidence is not to impeach the character or credit of a witness. *Higgins v. Star Elec., Inc.,* 908 S.W.2d 897, 903[1] (Mo.App.1995). Defendants cannot prove those elements.

Plaintiff testified *at trial* that he worked for the apartment complex. This disproves the first element. Even if Defendants had no advance knowledge of Plaintiff's job, they had full opportunity at trial to further cross-examine Plaintiff about his

---

**15.** In our case, Defendants attempt to characterize Plaintiff's failure to supplement his interrogatory answer from May of 2000 as corroboration evidence. This is not the type of "strong and clear evidence" to which the *Heed* court referred.

job and what it entailed. However, Defendants, for whatever reasons, chose not to pursue that line of questioning. Their failure to cross-examine Plaintiff in more detail on this subject suggests a lack of due diligence.[16] At the very minimum, Defendants could have asked about the nature of his work, the number of hours worked, and the physical activity required. Another shortcoming of this argument is that noted in our discussion regarding perjury. At best, the affidavits would merely impeach Plaintiff's testimony by indicating the extent of his work and injuries. This cannot be a basis for a new trial because of the sixth element. Finally, we believe this comment by the Supreme Court of Missouri is apropos here:

> "As a matter of public policy, courts generally look with disfavor upon after-trial facts which go no further than tending to establish that the bodily condition of a plaintiff in a personal injury action was not in fact as bad as may have been represented by [trial testimony]. And courts are, and should be, reluctant to order a new trial ... unless the after-trial facts ... are of such *decisive and conclusive character* as to render a different result reasonably certain."

*Curry v. Thompson,* 247 S.W.2d 792, 798[3,4] (Mo.1952). Point VI is denied.

The judgment of the trial court entered upon the jury's verdict is affirmed.

MONTGOMERY, J., and BARNEY, C.J., concur.

---

**16.** This is true even under lesser standards of diligence when a party has been affirmatively · misled. *See Foerstel v. St. Louis Pub. Serv. Co.,* 241 S.W.2d 792, 795 (Mo.App.1951).