John C. LOGAN, III and Christina M.
Logan, Plaintiffs–Appellants,

v.

SHO–ME POWER ELECTRIC COOP-
ERATIVE and Irby Construction
Company, Gary Gorman, and Ron
Marlin, Defendants–Respondents.

No. 25318.

Missouri Court of Appeals,
Southern District,
Division Two.

Nov. 25, 2003.

Roger G. Brown, Roger G. Brown and Associates, Jefferson City, for appellants.

Michael P. Mergen, Hall, Ansley, Rodgers & Condry, P.C., Springfield, for Respondents Sho–Me Power Electric Cooperative and Ron Marlin.

Debbie S. Champion, Rynearson, Suess, Schnurbusch & Champion, L.L.C., St. Louis, for Irby Construction and Gary Gorman.

KENNETH W. SHRUM, Judge

John Logan, III, and Christina Logan ("Plaintiffs") are the parents of John Logan, IV ("Logan"), who was fatally electrocuted while working for Irby Construction Company ("Irby"). At the time of Logan's death, Irby was an independent contractor working for Sho–Me Electric Cooperative ("Sho–Me") per a written construction contract. Plaintiffs filed a wrongful death lawsuit naming as defendants (1) their son's employer, Irby; (2) Gary Gorman ("Gorman"), Irby's job superintendent; (3) the landowner, Sho–Me; and (4) Ron Marlin ("Marlin"), Sho–Me's engineer on the project.[1]

The trial court sustained Irby's and Gorman's motions to dismiss based upon a lack of subject matter jurisdiction, believing that Plaintiffs' exclusive remedy against Irby and Gorman lies pursuant to the Workers' Compensation Act. The court also sustained a motion for summary judgment in favor of Sho–Me and Marlin. This appeal followed. We affirm in part; we reverse in part and remand.

## FACTS

In June 1997, Sho–Mo entered into a standard rural utilities service contract with Irby. The contract required Irby to

---

1. Collectively, we refer to Irby, Sho–Me, Marlin, and Gorman as "Defendants."

install 63.8 miles of fiber-optic cable near existing power lines and perform "associated structure reinforcement on existing energized ... lines" owned by Sho–Me in Phelps, Pulaski, and Maries counties. The contract provided, *inter alia,* that Irby was to maintain workers' compensation insurance covering all of its employees. Irby complied with that contract provision; consequently, a workers' compensation policy insuring Irby's employees was in effect when Logan was fatally electrocuted on November 11, 1997.

At the time of his death, Logan was working for Irby near one of Sho–Me's "energized 69 KV lines." In part, Plaintiffs' petition alleged Logan's job assignment on November 11 was to "conduct ... fiber optic cable installation tasks" on Sho–Me's line, such as attaching cable to the structure (also known as "clipping"). They further alleged that both Irby and Sho–Me required Logan to work in "close proximity" to the subject line.

On May 20, 1999, Plaintiffs filed a claim with the Division of Workers Compensation ("Division") in which they alleged Irby *"intentionally* ... exposed [Logan] to the hazard of electrocution." After making specific factual allegations, Plaintiffs asked Division to find that "the acts of [Irby] were, in fact intentional and create a KILLIAN cause of action[ ]" and requested leave "to proceed directly against the employer in the Circuit Court of Camden County for the wrongful death of [Logan] which occurred as a direct and proximate result of the intentional acts of [Irby]."[2]

At essentially the same time, Plaintiffs sued Irby and Sho–Me, seeking damages for the alleged wrongful death of their son. Ultimately, in their second amended petition, they added Marlin and Gorman as defendants.

Irby and Gorman moved to dismiss Plaintiffs' petition on the ground that the trial court lacked subject matter jurisdiction. They claimed that the Workers' Compensation Act provided the exclusive remedy available to Plaintiffs for the death of Logan and served to insulate them from other liability for his death. Sho–Me and Marlin filed motions for summary judgment that also invoked the exclusivity provisions of the law as grounds for a judgment favorable to them. The trial court sustained Defendants' respective motions and entered judgment for Defendants. This appeal followed.

## DISCUSSION AND DECISION

For the most part, the exclusivity language that undergirds the trial court's judgment is found in section 287.120, as follows:

"1. Every employer subject to the provisions of this chapter shall be liable, irrespective of negligence, to furnish compensation under the provisions of this chapter for ... death of the employee by accident arising out of and in the course of his employment, and shall be released from all other liability therefor whatsoever, whether to the employee or to any other person....

"2. The rights and remedies herein granted to an employee shall exclude all other rights and remedies of the employee, his ... parents...or otherwise on account of such...death, except such rights and remedies as are not provided for by this chapter."

In the following points relied on, Plaintiffs advance various theories why their wrongful death claim against the Defendants is viable, i.e., the exclusivity provi-

---

**2.** The phrase "KILLIAN type of action" is an apparent reference to *Killian v. J. & J. Instal-* *lers, Inc.,* 802 S.W.2d 158 (Mo.banc 1991), and the analysis made therein.

sions of the Workers' Compensation Act do not attend here; consequently, they argue the trial court should be reversed.

### Point I: Plaintiffs' claim against Sho–Me

■ Generally stated, the first point on appeal involves the issue of Sho–Me's liability for Logan's death. Plaintiffs argue that Sho–Me is liable because: (1) as a *supplier of electricity*, it had a non-delegable duty to provide "the **highest degree of care** to prevent a foreseeable injury," and (2) even if the duty could be delegated, Sho–Me failed to do so because it retained substantial possession and control of the premises and the construction project. In order to answer their claim on appeal, we must examine certain principles of premises liability for landowners.

■ Under the common law, a landowner has a duty to use reasonable and ordinary care to prevent injuries to a business invitee on the landowner's property. *Gillespie v. St. Joseph Light & Power Co.*, 937 S.W.2d 373, 375[3] (Mo.App.1996). An exception to this rule exists when a landowner relinquishes possession and control of the premises to an independent contractor during a period of construction. *State ex rel. Anheuser–Busch v. Mummert*, 887 S.W.2d 736, 738[5] (Mo.App.1994). This exception recognizes that the independent contractor is deemed to be the possessor of the land and the duty to use reasonable care to prevent injury shifts from the landowner to the contractor. *Id.*

The common law, however, recognized an "exception" to this exception when the activity performed by the independent contractor was inherently dangerous. *Matteuzzi v. Columbus P'ship, L.P.*, 866 S.W.2d 128, 130[2] (Mo.banc 1993). "If so, the landowner who commissioned the inherently dangerous work was said to have a nondelegable duty to take precautions to prevent injury from the activity." *Id.* Consequently, when an employee of an independent contractor is injured while working, he or she can obtain compensation from the landowner. *Halmick v. SBC Corporate Services, Inc.*, 832 S.W.2d 925, 927 (Mo.App.1992).

■ In 1991, the Missouri Supreme Court abolished the inherently dangerous exception to premises liability.[3] *Zueck v. Oppenheimer Gateway Properties*, 809 S.W.2d 384, 390[2] (Mo.banc 1991). "Landowner liability in such cases rests, not on the nature of the activity employed in, but on the degree of control a landowner maintains over the construction." *Halmick*, 832 S.W.2d at 928[6]. The *Zueck* rule has been applied to situations wherein an employee of an independent contractor was electrocuted while performing work for a landowner who was also a supplier of electricity. *Mummert*, 887 S.W.2d at 737–39; *Prayson v. Kansas City Power & Light Co.*, 847 S.W.2d 852, 853–58 (Mo.App.1992).

In prong (A) of Point I, Plaintiffs allege that Sho–Me, as a transmitter of electricity, "had a non-delegable duty" to use "the highest degree of care to prevent a foreseeable injury." Their argument is without merit. In *Prayson*, Larry Bunger was an employee of B & L Electric, Inc. (independent contractor), who was electrocuted while working on transformers owned by Kansas City Power and Light ("KCP & L"). His surviving children sued KCP & L "under the 'inherently dangerous activi-

3. "The supreme court held, in *Matteuzzi*, that the rule enacted in *Zueck* applies not only to *vicarious* liability of landowners, but also to actions of *direct* negligence of a landowner" for harm caused while an employee is engaged in inherently dangerous activity. *Mummert*, 887 S.W.2d at 738.

ty' doctrine." *Id.* at 853. The trial court entered a j.n.o.v. in favor of KCP & L because the *Zueck* case was decided while KCP & L's motion for new trial was pending. *Id.* The *Prayson* court applied the *Zueck* rule retroactively to hold that a supplier of electricity (KCP & L) could not be held liable for the electrocution of an employee (Bunger) of an independent contractor (B & L Electric). *Id.* at 853–58. This disposes of Plaintiffs first argument under Point I. Subpoint denied.

■ In their second argument under Point I, Plaintiffs claim that Sho–Me is still liable even if it could delegate its duty as a provider of electricity. They argue that, as a landowner, Sho–Me owed a duty of reasonable care to its invitees. Plaintiffs further allege that this duty cannot shift to an independent contractor (Irby) because Sho–Me retained substantial control of the construction site and the work performed thereon.[4]

■ In order to impose liability upon Sho–Me, the company's involvement in the construction project must be substantial. *Mummert,* 887 S.W.2d at 739[7]. "The right to insure proper performance of a contract is insufficient in itself to justify the imposition of such liability." *Halmick,* 832 S.W.2d at 929[8]. The "control" must reach beyond merely securing compliance with the contracts. *Id.* To demonstrate that Sho–Me retained possession of the land, Plaintiffs must show that Sho–Me

"controlled the jobsite and the activities of the contractor." *Matteuzzi,* 866 S.W.2d at 132[11]. Stated differently, "the owner must be controlling the physical activities of the employees of the independent contractors or the details of the manner in which the work is done." *Halmick,* 832 S.W.2d at 929[8].

For the most part, the "substantial control" allegations in Plaintiffs' petition are derived from provisions in the Irby/Sho–Me construction contract. On appeal, Plaintiffs limit their "substantial control" claims to (1) contract provisions they characterize as proof of Sho–Me's "exclusive control over the flow of electricity" and (2) contract provisions that Plaintiffs cast as evidence of "Sho–Me's frequent direction of Irby's employees."

As to the first category of contract provisions, (those allegedly showing Sho–Me's control over electricity), Plaintiffs cite two paragraphs. The first paragraph provided that Irby could not work upon "energized lines ..., unless otherwise specified in the Notice and Instructions to Bidders."[5] The second paragraph utilized by Plaintiffs is a "Line Switching" provision that required Irby to contact Sho–Me each morning to check the status of a line, whether energized or de-energized. Further, Sho–Me was required to "make every effort to insure that the lines are in a de-energized condition prior to any work being done on them."[6] In sum, Plaintiffs argue that

---

**4.** In making our decision under this subpoint, we must remember that this is a summary judgment review; consequently, we review the record in the light most favorable to the non-movants (Plaintiffs), and we give them the benefit of all inferences. *ITT Commercial Fin. Corp. v. Mid.–America Marine Supply Corp.,* 854 S.W.2d 371, 382 [19, 20] (Mo.banc 1993). If the record reasonably supports any inference other than those necessary to support a judgment for Sho–Me, a genuine issue of material fact exists and reversal of the summary judgment must follow. *Id.*

**5.** In making their argument, Plaintiffs blatantly ignore introductory language in the same section that required Irby to "take all reasonable precautions for the safety of the employees" and "comply with all applicable provisions of Federal [and] State" safety laws and codes.

**6.** Based on these provisions, Plaintiffs argue: (1) Sho–Me never relinquished control over the job site, particularly its power lines; (2) Sho–Me could dictate when lines would be energized and de-energized; (3) Irby had to

"Sho–Me had exclusive control over both the flow of electricity through the transmission lines and *when Irby could work on the lines.*" (Emphasis supplied.) The record, however, does not support such an argument.

First, Plaintiffs apparently argue that the "jobsite" merely consisted of the power lines. Contrary to those assertions, the job site was 63.8 miles of easements and rights-of-way owned by Sho–Me upon which was located existing pole structures, guy-wires, electric transmission lines, and other improvements. The contract placed Irby in "charge and control" of the job site "from the commencement of work to completion." Upon completion, Irby was to deliver possession and control of the job site to Sho–Me. Although Sho–Me retained the exclusive right to turn on or shut off electricity through the subject lines, its discretion in doing so was not unlimited. To the contrary, Sho–Me had to make "every effort to insure that the lines [were] in a de-energized condition prior to any work being done on them."

More than that, Sho–Me's sole control over putting in or withholding electricity to the lines did not serve as control over the physical activities of Irby's employees or the details of the manner in which the work was done. The contract clearly gave Irby the choice of whether it would work on an energized line or move to a different line section that could be de-energized. In keeping with that provision Irby assigned its employees to work "on energized lines all the way through[ ]" the job. As Gorman explained it, "we would have our hanging crew ... working below [the line].... They [Irby's employees] would

hang the hardware to keep the sequence moving." Continuing, Gorman testified: "If you finished this one [section of line] and waited to get this one de-energized, then you would have half your crew sitting while this crew went out and put their hardware up." Another significant contract provision made Irby responsible for safety measures for its employees. *See* n. 5.

Considering the contract in its entirety, along with all attendant circumstances, a jury could not fairly or reasonably find or infer that Sho–Me's contractual right to energize or de-energize its lines met the "substantial control" test, and thus, Sho–Me cannot be held liable because it did not retain possession of the premises.

Turning now to the second category of contract terms, (those that allegedly raise factual issues about Sho–Me's control of Irby's employees), Plaintiffs assert (a) Sho–Me supplied all materials and dictated how Irby's employees were to install cables, (b) Sho–Me created drawings and staking sheets that Irby was required to follow, and (c) Irby had to follow a sequence of construction approved by Sho–Me.

■ Although the contract provided that Sho–Me would furnish the materials specifically listed therein, it did not require Sho–Me to furnish *all* materials as Plaintiffs contend. Evidence is insufficient to impose liability when it merely shows that an owner provides an independent contractor with some of the materials with which to perform the construction and directs where the work is to be performed. *James v. Union Elec. Co.,* 978 S.W.2d 372, 377[15] (Mo.App.1998); *see also Owens v.*

follow Sho–Me's policies if it wanted its employees to work on a de-energized line; (4) Irby could not require Sho–Me to de-energize a line for the safety of its employees if Sho–Me otherwise told them the line could not be de-energized; and (5) when Irby's men worked on an energized line, Sho–Me was the only entity that could disable the reclosure for the safety of the men.

*Shop 'N Save,* 866 S.W.2d 132, 135[2] (Mo. banc 1993).

■ The contract obligated Irby to use and follow Sho–Me's detailed parts lists, specifications, construction drawings, and staking sheets. But, a contract that requires an independent contractor to use specified materials, follow detailed construction documents, and adhere to directives about the sequence of work are not sufficient to show an owner is so substantially involved in overseeing construction as to justify imposing liability on the owner. *See Williamson v. Southwestern Bell Tel. Co.,* 265 S.W.2d 354, 358–60 (Mo. 1954); *Boulch v. John B. Gutmann Const. Co.,* 366 S.W.2d 21, 29–30 (Mo.App.1963).

In this case, none of the provisions in the contract (such as those relating to specifications, drawings, or staking sheets), whether considered separately or together, are sufficient to impose liability. This follows because the provisions do not provide a basis for finding that Sho–Me retained such substantial oversight of the project, or right to control the work, as to raise a genuine material fact issue regarding imposition of liability upon Sho–Me. The cited documents and contract provisions simply are not a means by which Sho–Me could or did control the physical activities of Irby's employees or the details of the manner in which the work was to be performed, to the extent required by Missouri case law to impose liability. *See Williamson,* 265 S.W.2d at 358–60; *Halmick,* 832

S.W.2d at 929; *Boulch,* 366 S.W.2d at 29–30.

In sum, by no fair construction can this contract support Plaintiffs' arguments, or give rise to a material fact issue relating to Sho–Me's control of the physical activities of Irby's men or the details of the manner in which the work was to be performed. Sensibly read, the contract did not shift the duty to use reasonable and ordinary care to prevent injury from Irby back to Sho–Me because Irby maintained the status of landowner. *Halmick,* 832 S.W.2d at 929. Because no genuine issue of material fact existed concerning this issue, the trial court did not err in granting summary judgment for Irby. Subpoint denied.

### Point III: Plaintiffs' Claim Against Irby's Job Superintendent[7]

■ Plaintiffs' third point maintains that the trial court erred when it dismissed their wrongful death suit against Gorman, Irby's job superintendent. They argue that, contrary to the court's ruling, the court had subject matter jurisdiction over their suit against Gorman. Specifically, they argue their petition alleged "something more" than the mere failure on the part of co-employee Gorman to provide a reasonably safe workplace, i.e., the petition charged Gorman with a breach of a personal duty of care. Consequently, Plaintiffs allege that Gorman was not protected by the immunity provisions of sections 287.120.1–2.[8]

---

**7.** We decide Plaintiffs' third point before addressing Point II for ease of discussion.

**8.** In reviewing the grant of a motion to dismiss a petition, the facts alleged are considered true, all allegations are construed favorably to the plaintiff, and then it is determined whether the petition invokes principles of substantive law upon which relief can be granted. *Workman v. Vader,* 854 S.W.2d 560, 562[1] (Mo.App.1993). In determining the jurisdiction question, the court may consider affida-

vits, exhibits, and evidence pursuant to Rules 55.27 and 55.28. *Howell v. Lone Star Indus., Inc.,* 44 S.W.3d 874, 877[3] (Mo.App.2001); *Collier v. Moore,* 21 S.W.3d 858, 860[4] (Mo. App.2000); *Miller v. McDonnell Douglas Corp.,* 896 S.W.2d 734, 737 (Mo.App.1995). "Where a question of jurisdiction is in doubt, it should be resolved in favor of the Labor and Industrial Relations Commission. . . ." *Collier,* 21 S.W.3d at 860[5].

The immunity provisions of the Workers' Compensation Act extend to a co-employee or supervisor (Gorman) chosen to implement the employer's non-delegable duty to provide a reasonably safe workplace. *Sexton v. Jenkins & Associates, Inc.*, 41 S.W.3d 1, 5[12–14] (Mo.App. 2000); *Collier*, 21 S.W.3d at 861. A co-employee's failure to perform that duty does not give rise to a cause of action by another worker who is injured by that failure. *Sexton*, 41 S.W.3d at 5[15]. The injured employee must charge his fellow worker with "something extra" beyond the breach of general supervision and safety. *Id.* at 5[16].

This "something extra" is determined on a case-by-case basis and includes "any affirmative act, taken while the supervisor is acting outside the scope of the employer's duty to provide a reasonably safe environment, that breaches a personal duty of care the supervisor owes to a fellow employee." *Collier*, 21 S.W.3d at 861. Generally, cases in which the "something extra" element has been found are those in which supervisors personally took part in the "affirmative act" by directing employees to engage in dangerous activity that a reasonable person would recognize as hazardous and beyond the usual requirements of the employment.[9] *See, e.g., Tauchert v. Boatmen's Nat. Bank of St. Louis*, 849 S.W.2d 573, 574 (Mo.banc 1993); *Wright v. St. Louis Produce Mkt., Inc.*, 43 S.W.3d 404, 414–15 (Mo.App.2001); *Pavia v. Childs*, 951 S.W.2d 700, 701–02[2] (Mo. App.1997); and *Hedglin v. Stahl Specialty Co.*, 903 S.W.2d 922, 927 (Mo.App.1995).

In their petition, Plaintiffs claimed that (1) Gorman directed Logan to work around an energized power line when he knew Logan was merely an apprentice lineman; (2) Gorman authorized the line to be energized thereby "creat[ing] a hazardous condition[;]" and (3) by directing Logan to work on the line, "Gorman was directing [Logan] to engage in a dangerous condition that a reasonable person would recognize as hazardous beyond the usual requirements of employment." Plaintiffs allege these facts are sufficient to preclude exclusive jurisdiction of the Commission.

In the motion to dismiss, however, Gorman alleged that it was necessary to work on energized lines on occasion through the regular scope of employment. Plaintiffs *admitted* this allegation. Moreover, in their brief, Plaintiffs admit that the details of the project fully contemplated work upon energized lines.

Plaintiffs have alleged nothing more than a failure by Gorman to provide a reasonably safe workplace. Plaintiffs fully admitted that the requirements of Logan's job mandated working on energized lines on certain occasions. As such, their allegations in the petition, that Gorman "created" dangerous or hazardous conditions "beyond the usual requirements of employment[,]" are wholly refuted by Plaintiffs' admissions to the contrary. Specifically, Plaintiffs', in response to the motion to dismiss and in their brief on appeal, admit that the usual requirements of *this type of employment* mandate work upon energized lines occasionally. The failure of Gorman to adequately supervise Logan, an apprentice lineman, in the completion of his duties is insufficient to meet the "something extra" requirement of pleading a

---

**9.** A close reading of the "something extra" cases presents ample evidence of the hardship, in discerning the limits of the doctrine, imposed on courts and litigants alike. We note here that the tide has shifted considerably among the states in favor of co-employee immunity. *Gunnett v. Girardier Bldg. and Realty Co.*, 70 S.W.3d 632, 637 n. 6 (Mo.App. 2002).

cause of action for co-employee liability beyond the Workers' Compensation Act. If any, Gorman's failure is simply the failure to provide a safe work environment. Gorman did not violate any personal duty owed to Logan. *See Gunnett*, 70 S.W.3d at 635–641.

Consequently, the trial court did not err in granting Gorman's motion to dismiss for lack of subject matter jurisdiction. Point denied.[10]

### Point II: Plaintiffs' Claim Against Sho–Me's Engineer

Plaintiffs' second point maintains the trial court erred by entering summary judgment for Marlin, Sho–Me's engineer. In developing this argument, they acknowledge "that an agent [Marlin] is not liable to third person [Logan] for a mere failure to perform a duty owing to his principal [Sho–Me] only."[11] They insist, however, that an agent "remains liable for acts or omissions causing injuries to third persons to whom he owes an [independent] duty of care."[12]

Having stated these general principles, Plaintiffs assert generally that "[s]ufficient evidence was generated to create a genuine issue of material fact as to whether Marlin breached an independent duty of care that he owed to Logan." Plaintiffs' argument then proceeds as follows:

"As Sho–Me's project engineer assigned to the Irby project, Marlin played a key role in ensuring that appropriate safety precautions were taken before Irby personnel, including Logan, performed work near the power lines. That created a duty of care running from Marlin to the Irby employees that was independent of any duty Marlin owed to his employer.

"The most significant of Marlin's responsibilities were to ensure that the lines were de-energized where Irby employees were working and that one-shot orders were issued before Irby employees worked near energized lines. Since Marlin determined the sequence of work, he knew on which segments of line the Irby employees would be working.

"Marlin released clearance order # 3722 at 4:11 p.m. on November 8, 1997, allowing the power line between Richland and Crocker to be energized. Marlin breached his duty of care to Logan when he failed to ensure that Logan worked on a de-energized line or did not work on an energized line for which a one-shot order had not been issued for the line on the day Logan was electrocuted. Marlin also spent considerable time observing the work done by Irby employees and thus would have been aware that Logan and other Irby employees were not provided with proper equipment and tools for working in the vicinity of energized lines, such as insulated measuring devices so the workmen could safely measure their distance relative to the energized line. Marlin also played a key role in determining how close the

---

10. We do not ignore Plaintiffs' principal reliance upon *Hedglin*. That reliance, however, is misplaced. In *Hedglin*, the plaintiff died after he fell into a vat of scalding water; he was instructed, by his supervisor, to "suspend himself" over the vat via a cable or chain "rigged" to a forklift (operated by his supervisor) in order to remove a grate. *Id.* at 924–27. We find it incomprehensible that this type of activity, i.e., hanging over a vat of scalding water, would be included in one's

"usual requirements of employment." Here, Logan was engaged in activities that fell within the scope of his usual employment.

11. As authority, Plaintiffs cite *Giles v. Moundridge Milling Co.*, 351 Mo. 568, 173 S.W.2d 745, 751 (1943).

12. For this proposition, Plaintiffs cite *General Elec. Capital Corp. v. Rauch*, 970 S.W.2d 348, 356 (Mo.App.1998).

Irby employees would have to be to the energized electrical line." (Transcript citations omitted.)

We have reproduced Plaintiffs' argument to show its brevity, absence of on-point authority, and the difficulty in trying to understand Plaintiffs' claims regarding Marlin's alleged duty to Logan. Plaintiffs' allegations and transcript citations focus almost exclusively on a standard of care related to conditions on the land (premises liability), specifically the presence of energized power lines. To the extent Plaintiffs argue Marlin owed a duty to Logan based on a premises liability theory, that argument was implicitly answered adversely to Plaintiffs in our Point I analysis.

Therein, we found Sho–Me had relinquished possession and control of the "project site" to Irby; consequently, the duty to ensure that reasonable and ordinary care was exercised on the project site shifted to Irby. See *Matteuzzi*, 866 S.W.2d at 132[10]. Since Irby possessed the job site and Marlin was not Irby's employee or agent, it cannot be validly argued that Marlin had potential liability as an owner or possessor of the land absent an allegation that Marlin's conduct, and Sho–Me's ratification thereof, "reshifted" the duty to prevent injury from Irby back to Sho–Me. Neither Plaintiffs' arguments, nor their pleadings, nor anything else in the record, supports that notion. On this record, the public policy and reasoning, underlying the rule that shifted the duty of care to Irby and relieved Sho–Me of that duty during the construction period, serves to relieve Sho–Me's employee (Marlin) of the duty of care to make the premises safe. To the extent Plaintiffs argue otherwise, we reject such a proposition.

■ On the other hand, if Plaintiffs intend by their argument to say that Marlin's alleged *independent* duty of care is analogous to that asserted against Gorman (which requires a showing of "something extra"), that argument has been answered adversely to them by our analysis of Point III. This follows because any potential "something extra" allegations against Marlin are essentially identical to those leveled against Gorman and merely charge a failure to provide a safe work environment.

■ Finally, Plaintiffs made a new claim against Marlin at oral argument, one not presented to the trial court nor mentioned in briefs filed with this court. Specifically, they asserted Marlin's "independent duty of care" can be "extrapolated" from *Butts v. Express Personnel Services*, 73 S.W.3d 825 (Mo.App.2002) (holding no statutory immunity via the Workers' Compensation Act attended where two subcontractors were separately and independently hired by a general contractor; consequently, an employee of one "parallel" subcontractor could sue an employee of the other "parallel" subcontractor as a negligent third party). By saying Marlin's alleged duty can be "extrapolated" from *Butts*, Plaintiffs implicitly concede that *Butts* dealt with issues wholly different than those presented here. More than that, Plaintiffs never explained how that "extrapolation" is to occur, nor can we readily discern how that might be done. In a negligence case, a plaintiff's initial burden is to establish a duty in the defendant to protect the plaintiff from injury. *Id.* at 835. Plaintiffs have not met that burden by their belated and undeveloped reference to *Butts*.

In sum, Plaintiffs' reliance on *Butts* is an argument that has not been preserved for our review and will not be considered by this court. *State ex rel. Nixon v. Am. Tobacco Co., Inc.*, 34 S.W.3d 122, 129 (Mo. banc 2000). "When counsel ... do not sufficiently advise the court of the contentions asserted and the merit thereof, the

court is left with the dilemma of deciding that case (and possibly establishing precedent for future cases) on the basis of inadequate briefing and advocacy or undertaking additional research and briefing to supply the deficiency." *Thummel v. King,* 570 S.W.2d 679, 686[10] (Mo.banc 1978). It is not this court's function to serve as an advocate for Plaintiffs, and it would be unfair to other parties if it were otherwise. *Id.* at 686[9].

Point II is denied.

### Point IV: Alleged Error In Not "Staying" Suit Against Irby

 Plaintiffs' fourth point maintains the trial court erred in dismissing their suit against Irby. Plaintiffs allege that their suit against Irby sounds in intentional tort, not negligence. They acknowledge that, per *Killian,* the question of whether an employee's injuries were the product of an accident or an intentional act by the employer lies within the exclusive jurisdiction of the Labor and Industrial Relations Commission.

Because of *Killian,* they filed a claim with the Division of Workers' Compensation alleging that Logan's death did not result from an accident, but was the result of an intentional act. They insist, however, that *Killian* does not mean the two cases, i.e., the wrongful death suit and the workers' compensation claim, cannot be pending at the same time. Plaintiffs argue that the trial court should have stayed or held in abeyance the wrongful death suit until the commission resolved the "accident versus intentional act" issue. There is merit to this argument.

 Our review of the trial court's decision to dismiss for lack of subject matter jurisdiction is for an abuse of discretion. *Jenkins v. Croft,* 63 S.W.3d 710, 712[9] (Mo.App.2002). Judicial discretion is abused only where the ruling is clearly against the logic of the circumstances before the court and is so arbitrary and unreasonable as to shock the sense of justice, indicating a lack of careful consideration. *Id.* at 713[10].

Irby relies heavily on *Killian* as support for the correctness of the trial court's action. However, the *Killian* case did not plow new ground. To the contrary, *Killian* relied "[on] the strength of ... recent precedent," specifically *State ex rel. McDonnell Douglas Corp. v. Ryan,* 745 S.W.2d 152 (Mo.banc 1988). The court held that the Commission has sole jurisdiction to decide if an employee's on-the-job injury is the product of accident or the employer's intentional act. *Killian,* 802 S.W.2d at 161[3].[13]

Neither *Killian* nor *Ryan* addressed the question presented here, namely, whether an intentional tort case can be filed and left pending in the circuit court until the Commission decides the "accident versus intentional conduct" issue. Cases exist, however, that shed light on the issue.

In *State ex rel. Kansas City Stock Yards v. Clark,* 536 S.W.2d 142 (Mo.banc 1976), the wife and minor children of Roy Ruis (deceased) unsuccessfully sought to recover compensation under the Kansas Workmen's Compensation Law. More than a year after Ruis' death, they filed a wrongful death lawsuit in Missouri against Ruis' employer. Via a writ of prohibition, the employer asked that the trial judge be prevented from proceeding further in the

13. *See also Hannah v. Mallinckrodt, Inc.,* 633 S.W.2d 723, 727 (Mo.banc 1982) (holding Commission has exclusive jurisdiction to decide accident versus intentional act issue; to recognize concurrent authority in circuit court to decide that question would nullify legislative intent to place exclusive jurisdiction in Commission).

wrongful death lawsuit. The writ was issued despite an argument by the Ruis dependents that filing of the claim for compensation in Kansas tolled the Missouri statute of limitations. The *Kansas City Stockyards* court explained: "There was no reason why [the wrongful death suit] could not have been timely filed in Missouri. There could only be one recovery but *both matters could have been pending at the same time.*" 536 S.W.2d at 146[12]. (Emphasis supplied.)

In *Lamar v. Ford Motor Co.,* 409 S.W.2d 100 (Mo.1966), the issue was whether the injured party was an employee. For that reason, the *Lamar* court concluded the "primary jurisdiction" doctrine, which was later applied in *Killian,* was not implicated. *Lamar,* 409 S.W.2d at 107. However, in analyzing the primary jurisdiction rule and when it applies, *Lamar* cited with approval *Somma v. United States,* 283 F.2d 149 (3rd Cir.1960):

"The most closely analogous situation in which we have found the doctrine applied was in *Somma* . . . . There a federal employee sued for personal injuries under the Federal Tort Claims Act. The defense was interposed that plaintiff's exclusive remedy was under the Federal Employees' Compensation Act. Applying the doctrine of primary jurisdiction, the court ordered the tort action stayed until the plaintiff had pursued his remedies under the Federal Employees' Compensation Act."

*Id.* at 106.

In *State ex rel. Riss Int'l Corp. v. Sanders,* 604 S.W.2d 632 (Mo.App.1980), an employer (Riss), named as defendant in the underlying wrongful death case, asked that the circuit judge be prohibited from acting in the case (other than dismissing the same). The basis for the request was that any rights plaintiffs had at common law were supplanted by the Workers Compensation Act. In quashing its preliminary writ, the eastern district declared:

"Section 287.120(1) and (2) [the exclusivity provisions of the Workers' Compensation Act] *does not prohibit the filing of the wrongful death action at the same time a workmen's compensation action is pending.*

. . . .

"The harsh result in our recent case of *Langendoerfer v. Hazel,* 601 S.W.2d 290 (Mo.App.1980), highlights the advisability of the filing of a separate action under the circumstances existing in this case. In *Langendoerfer,* claimant filed a claim with the Division of Workmen's Compensation which denied the claim on the ground that the injury was not caused by an accident. She then filed the common law action almost seven years after the accident. The trial court dismissed it on the ground that it was barred by the statute of limitations."

*Id.* at 633–34. (Emphasis supplied.)

We do not read *Killian* as rejecting what was said in *Kansas City Stockyard,* i.e., that an injured employee can have both a common law tort claim and a claim for workers' compensation *pending* at the same time. Nor do we understand *Killian* to be inimical to the procedure followed in *Somma* (as discussed in *Lamar*), namely, staying the tort action until the workers' compensation claim was decided. Sensibly read, *Killian* merely reaffirms that a trial court does not have authority to decide if an on-the-job injury resulted from an accident or an intentional act by the employer. 802 S.W.2d at 161[3].

■ "A court has subject matter jurisdiction if the petition states a claim belonging to the general class of cases over which the court's authority extends." *Burns v. Elk River Ambulance, Inc.,* 55 S.W.3d 466, 473[5] (Mo.App.2001). "Cir-

cuit courts have original jurisdiction over all cases and matters, civil and criminal." *Id.* at 473; § 478.070. Based on *Kansas City Stockyards, Somma,* and *Riss International Corp.,* we find the trial court abused its discretion by dismissing Plaintiffs' suit against Irby and refusing to stay or hold in abeyance that count of Plaintiffs' petition until the Commission resolved the "accident versus intentional act" issue. Consequently, the judgment dismissing Plaintiffs' suit against Irby must be reversed and the cause remanded with directions to act in accordance with this opinion as to that point. The judgment is affirmed on Points I, II, and III.

PARRISH, P.-CONCURS.

RAHMEYER, C.J.-CONCURS.